Sam McHONEY, Herbert Dunmeyer, John Smith, Franklin White, Robert Jenkins, Chapel Mouzon, Limon Joyner, Felix McKnight, Luther Moore, Thomas Burch, and John Bowens, Appellants,

v.

MARINE NAVIGATION COMPANY, Inc., (Substituted for Marine Transport Lines, Inc.) Appellee.
No. 7141.

United States Court of Appeals Fourth Circuit.

Argued April 12, 1956.

Decided May 23, 1956.

Robert Klonsky, New York City (I. H. Jacobson, Charleston, S. C., on brief), for appellants.

Charles W. Waring, Charleston, S. C., and Walter X. Connor, New York City (Kirlin, Campbell & Keating, New York City, and Waring & Brockinton, Charleston, S. C., on brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and PAUL, District Judge.

DOBIE, Circuit Judge.

This was a civil action filed by Sam McHoney and others, as plaintiffs, against the Marine Navigation Company, Inc., (hereinafter called Navigation), as defendant. The case, tried before a District Judge and jury in the United States District Court for the Eastern District of South Carolina, resulted in a verdict and judgment in favor of Navigation. McHoney and the other plaintiffs have appealed to us.

The amended complaint alleged that McHoney and the other plaintiffs were

longshoremen employed to unload a cargo of bulk sulphur at the Columbus Street Docks in the Port of Charleston, South Carolina, from the SS Marine Merchant, owned by Navigation; that while Mc-Honey and the other plaintiffs were employed in their work in the No. 2 hold of the vessel on February 5, 1952, a flash fire occurred causing them serious bodily injury; that the cause of the fire and consequent injuries was due to the unseaworthiness of the vessel and/or to negligence on the part of Navigation, its agents and servants, in a number of particulars; that by reason of the injuries resulting from the fire, McHoney and the other plaintiffs were entitled to recover various sums totaling $890,000.00.

By the stipulation of the parties, upon this appeal we are limited to a single question: Did the District Court err in failing to charge the jury as a matter of law that the United States Coast Guard Regulation referring to sulphur as a dangerously inflammable cargo and requiring a "fire hose supplied with fresh water from a shore supply source" at each hatch, was applicable herein during unloading of sulphur, and that the violation thereof constituted negligence per se?

We think this question must be answered in the negative, so that the judgment of the District Court must be affirmed. Our decision is rested squarely upon the ground that the Coast Guard Regulation in question *does not apply* to the *unloading* of sulphur.

We quote the Coast Guard Regulation in effect at the time of the flash fire on the SS Marine Merchant:

"Extract From Table K Of Coast
Guard Regulation

"(Effective February 5, 1952)

"In the loading or unloading of sulphur in bulk the following conditions shall be complied with:

"(a) When sulphur in bulk is loaded in a deep hold with general cargo in the Tween Deck hold above the sulphur a dust proof wooden bulkhead inclosure shall be built in the hatchways from the over deck of the lower hold to the weather deck forming a tight enclosure to prevent sulphur dust entering the Tween Decks during loading.

"(b) Holds shall be cleaned of all debris.

"(c) Ceiling shall be made tight to prevent sulphur dust finding its way into the bilges; any chinking necessary in the way of tank tops or bilges shall be with noncombustible material.

"(d) In order to minimize the movement of fine sulphur dust during the loading, cowl ventilators serving the hold into which the sulphur is being loaded shall be blanked off to prevent circulation of air.

"(e) 'No Smoking' signs shall be conspicuously displayed, and the officer in charge of loading shall see that they are observed.

"(f) An oxygen breathing apparatus, or proper gas mask, shall be made readily available.

"(g) *A fire hose, supplied with fresh water from a shore supply source, shall be available at each hatch through which the sulphur is being loaded.* (Italics ours.)

"(h) Upon completion of loading, the sulphur shall be leveled off and the sulphur dust deposited during the process of loading, being extremely inflammable, shall be cared for by sweeping or washing it down. This applies to the decks and to the overhead structure within the holds.

"(j) After unloading, all residue of sulphur dust shall be thoroughly cleaned out of cargo holds before loading other cargo therein.

"(k) When sulphur is loaded by metal chute method, provision shall be made for proper grounding of the chute, using flexible cable to prevent static discharge."

In the first line of the Regulation are the words "loading or unloading of sulphur." Then follow ten sub-sections, lettered from (a) through (k). Some of these sub-sections apply only to loading; others clearly affect only unloading.

Thus, (d), as to cowl ventilators applies only to loading; likewise, (k) is concerned solely with loading "by metal chute method". Sub-section (h) specifies the necessary precautions "upon completion of loading." And (j) requires the cleaning out of cargo holds "after unloading" and "before loading other cargo." And some of the required precautions, which are set out generally with no mention of "loading" or "unloading", clearly apply to both operations. Thus, (f) requires "An oxygen breathing apparatus, or proper gas mask, shall be made readily available."

█ We, therefore, think that the preliminary statement that the prescribed conditions apply to "the loading *or* (a disjunctive conjunction) unloading of sulphur," followed by specific provisions, some of which apply to loading, others only to unloading, and some to both operations, show clearly that the draftsmen of the Regulation clearly recognized the difference between the loading and unloading of sulphur and for these two operations they prescribed different precautions. Thus, in sub-section (g), which is before us, it is definitely stated that "A fire hose * * * shall be available at each hatch through which the sulphur is *being loaded*." (Italics ours.) Not a mention of "unloading." *Expressio unius est exclusio alterius.* There appear to be no decided cases directly in point here.

It is of little use to argue that the fire hose is just as necessary in unloading as in loading, that flash fires, such as the one involved here, are just as apt to break out in unloading as in loading. We are here concerned not with what the Regulation should have required, but rather with what it did require. It is our considered view that the clear language of sub-section (g) means just what it says, and no more. It is, therefore, concerned only with loading and has no application to the unloading of sulphur.

After the accident here involved, sub-section (g) of the Regulation was amended to read:

"(g) A fire hose, preferably supplied with fresh water from a shore supply source, shall be available at each hatch through which sulphur is being worked."

As thus amended, sub-section (g) clearly applies both to the loading and unloading of sulphur. McHoney and the other plaintiffs argue that the amendment merely made explicit what was before implicit, and that sub-section (g), before the amendment, did apply to unloading. Navigation, on the other hand, contends that the amendment changed the meaning of sub-section (g) and for the first time brought unloading within the ambit of the sub-section. We must agree with the contention of Navigation.

█ The Coast Guard Regulation is in the nature of a penal regulation, promulgated by the Coast Guard pursuant to Title 46 U.S.C.A. § 170, Subsection 7. Subsection 15 of the same section of the code provides that "When the death or bodily injury of any person results from the violation of this section or any regulations made in pursuance thereof" the person who violated the provisions of the section or the regulations shall be fined "not more than $10,000 or imprisoned not more than ten years, or both." Other severe penalties are prescribed against the owner, charterer, agent, master or person in charge of the vessel when these regulations are violated. Accordingly, it should not be expansively interpreted. Cf. Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52; Schmokey v. United States, 10 Cir., 182 F.2d 937. Had the original Regulation been intended to apply to unloading, it would have been a very simple matter to add the words "or unloaded." Consistency in interpreting the Regulation, we think, requires the construction that when the words "loading" or "loaded" are used, it was not intended that these words should also mean "unloading" or "unloaded."

█ It may be well to add that the question of the defendant's negligence was fairly submitted to the jury which

found a verdict against the complainants. There was abundant evidence from which the jury could have found that there was an adequate supply of water from the shore which was actually used to extinguish the fire. It is true that the interpretation of the Regulation was a matter for the Judge and not the jury, but the plaintiffs were not prejudiced by the Judge's failure to instruct the jury on this point. During the course of the trial he stated in the presence of the jury that, in his opinion, the Regulation applied to unloading as well as loading but he left this question to the jury in his formal charge, to which no exception was taken. It is obvious that the complainants had a fair trial and that they are not entitled to a reversal of judgment on the point to which they have confined their appeal.

For the reasons previously set out, the District Court did not err in failing to charge the jury that sub-section (g) of the Coast Guard Regulation was applicable here to the *unloading* of the sulphur. The judgment of the District Court must, therefore, be affirmed.

Affirmed.